Paul B. PALMER et al., Plaintiffs-Appellees, Cross-Appellants,

v.

Jack HOWARD et al., Defendants-Appellants, Cross-Appellees.

Jack HOWARD et al., Third-Party Plaintiffs-Appellants, and Cross-Appellees,

v.

K. E. WILSON, Third-Party Defendant and Appellee.

Nos. 73–1341, 73–1342.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Nov. 14, 1973.

Decided Jan. 21, 1974.

Rehearings Denied Feb. 26, 1974.

Albert B. Wolf of Meer, Wolf & Slatkin, Denver, Colo. (Sutin, Thayer & Browne, Albuquerque, N. M., on the brief), for defendants-appellants and cross-appellees.

**832**

W. Robert Ward, Denver, Colo. (Reed L. Frost, Farmington, N. M., on the brief), for plaintiffs-appellees and cross-appellants.

Wayne D. Williams of Williams, Erickson & Wallace, P.C., Denver, Colo., for third-party defendant and appellee.

Before MURRAH, SETH and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This action involves the relative rights of a large number of contracting parties under a joint venture agreement, the purpose of which was to develop, construct and operate a shopping center in Farmington, New Mexico.

There are two groups of joint venturers, the interests of the members of each being substantially similar. On the one hand is the so-called Palmer segment consisting of four Palmers and their wives. In the other, the so-called Howard group, are Jack Howard, Tom Howard, Willard Brockway and Francis Brockmann. An original member of the Howard associates was K. E. Wilson. There is now an independent dispute between the Howards and Wilson.

In general, the joint venture agreement called for the Palmer contingent's furnishing the land on which the shopping center was to be built. The Howard group, on the other hand, was given the responsibility for the planning, financing and construction of the shopping center. The Howards were to act as the general contractor for the construction of the shopping center, whereas Wilson was to have responsibility for the leasing and financing.

The main dispute is the meaning of a contractual provision stating that the construction and development costs were not to exceed the long-term financing, which sum was $1,725,000. The trial court ruled that this contract provision operated as an absolute limitation on the Howards in constructing the shopping center and it followed that the amount that the construction costs exceeded the loan funds, namely $108,000, had to be paid by the Howard group. The Howard group had apparently advanced this sum and hence found it necessary to take the initiative in an effort to retrieve it.

The Palmers filed the initial action seeking an accounting and what in effect was a judicial interpretation that they were not responsible under the contract to contribute amounts in excess of the loan. The Palmers also sought damages for construction work allegedly performed improperly and damages for construction funds spent improperly. The Howards' counterclaim sought damages for the Palmers' share of construction costs exceeding the funds originally loaned. The Howards also claimed that they were entitled to a fee of five percent of the total cost of construction, maintaining that the Palmers were obligated as joint venturers to pay one-half of that fee.

There was a separate contract which was entered into between the Howards and Wilson. The original joint venture agreement had been dated July 1967. The contract between the Howards and Wilson was dated July 1, 1968. It dealt with the procedure to be followed should additional capital contributions be required to meet the cost of construction and future operating costs. It prescribed, first, that there be negotiations with the Palmer group looking to the obtaining of additional money from them. Secondly, if the efforts to persuade the Palmers failed, the Howards and Wilson agreed to obtain secondary financing by pledging their own interests in the shopping center. They also agreed to pay their proportionate share of any necessary additional funds, in the event that secondary financing could not be obtained.

The record reveals that some efforts were made to negotiate with the Palmers when the need for additional funds arose. These attempts were not successful, although the Palmers maintain that no formal demand for funds was ever made. In any case, we fail to see the relevance of this dispute since, as pre-

viously noted, all additional funds were advanced by the Howards.

A third-party action was filed and prosecuted by the Howards against Wilson seeking a contribution of his share of the excess costs (allegedly amounting to 40 percent of the Howard group's interest in the shopping center). This being based on an indemnity agreement, the action was predicated on the contingency that the Palmers would prevail in the action. The trial court denied relief on this third-party claim. It did so by reasoning that the indemnity agreement between Wilson and the Howards was to become effective only in the event that additional capital contribution was required by reason of insufficient funds to meet the cost of construction and that the Howards had not proven that the long-term loan was insufficient to meet the construction costs. Thus, the judge ruled that the Howards were obligated to prove that the need for additional funds did not arise from the Howards' negligence. The trial court upheld the right of Wilson to have his fee during the course of the construction. The fact that Wilson had been paid $24,000 during the construction out of the loaned funds was not deemed significant by the trial court.

The sum of $19,122.10 had been paid to Brockway, a member of the Howard group, out of the construction funds. The court held that this was a proper expenditure, though a part of the five percent overhead fee. The court also approved the expenditure of $29,709.41, which was paid to two loaned employees of Howard related companies. The sum of $65,200 was paid to the H. C. Flaugh Company to coordinate and supervise the subcontracts and the purchasing of material. This was also held to be a proper construction fund expense.

These rulings are challenged by the Palmers as appellees and cross-appellants. The Palmers also maintain that the trial court erred in denying damages for deletions in the construction having a value, so they contend, of $134,000.

The contention of the Howards on appeal is that the trial court erred in denying its claim for the five percent fee, that is, in not requiring the Palmers to pay one-half of that. The Howards also claim here that the court erred in denying their demand for one-half of the cost of construction which exceeded the loan funds, that is, one-half of $108,000. As to the third-party defendant Wilson, the Howards demand that he pay his 40 percent share as a member of the Howard group.

Wilson has filed a cross appeal against the Howards in which he claims the balance of his five percent fee.

The parties to the joint venture agreement contemplated that some advance funds would be necessary for preliminary work, and so each of the groups initially deposited $5,000. It was expressed in the agreement that this fund should not exceed $30,000. It was the court's view that the Howards had the exclusive responsibility with respect not only to the construction but also to the expenditure of the funds; that the Palmers had no obligation to obtain financing or to do anything else in the development of the project and that their contribution of cash was not to exceed their share of the $30,000 of preliminary financing.

The court said that the Howards were limited to a five percent overhead fee for managing or contracting work. In ruling against the Howards on the issue of the excessive costs of the project, the court emphasized that the Howards (not including Wilson) were in complete control of the construction "and that having this responsibility, breached their fiduciary duty to the joint venture. It was their obligation to keep the construction costs of the project within the sum of $1,725,000.00, the amount of the long-term loan from Connecticut Mutual Life Insurance Company. The actual cost of construction exceeded the long-term loan by $108,142.73." The court continued:

. . . Notwithstanding the fact that unanticipated expenses for steel

pilings, relocation of sewer lines and extension of water lines increased the total cost of construction at the outset, Howard, Brockway and Brockmann exceeded the amount of the long-term loan at their own risk without obtaining the approval of the Palmers. The Palmer group cannot be required to contribute to the resulting overrun.

The Howards' third-party claim against Wilson was denied because the court found that Brockway (one of the Howard group) testified that construction costs could have been reduced had he eliminated certain features which were retained to enhance the appearance of the shopping center.[1]

The only issues which we need consider are the propriety of the court's rulings construing the contract so as to order the Howards to bear the risk of loss. Most of the trial court's rulings are factual and thus are not subject to review. We consider it essential, however, to take up the trial court's construction of the clause of the contract bearing on whether the Howard group had the risk of loss for excessive spending. Second-ly, whether the Palmers are required to contribute to the five percent fee of the Howard group and, thirdly, the extent, if any, of the liability of the third-party defendant Wilson.

## I.

## MEANING AND EFFECT OF CLAUSE 6 OF THE JOINT VENTURE AGREEMENT LIMITING THE TOTAL COST OF THE SHOPPING CENTER TO THE LOANED FUNDS

Ordinarily joint venturers share in losses as well as profits and do so on an equal basis. This is not invariable. The venturers are allowed to vary this general principle in their own specific agreement. 46 Am.Jur.2d 55, Joint Ventures, § 37, Contributions. The original joint venture agreement here, that of July 13, 1967 between the Palmer group and the Howard group, provided in clause 6 that:

> In no event shall the total development expenses, including the costs of leasing and construction, exceed the total amount of the long-term financing proceeds . . .

1. The trial court's final conclusions are summarized by the judge as follows:

"(1) Plaintiffs are entitled to an audit of the joint venture by an independent certified public accountant at defendants' expense to be made within ninety days from the date of entry of this order, subject to amendment and to the further order of this court, if necessary.

"(2) The Howard group, including Wilson, is entitled to an overhead fee of 5% of $1,725,000.00 or $86,250.00.

"(3) The sum of $24,310.97 will be deducted from Wilson's share of the 5% overhead fee due the Howard group.

"(4) The sum of $19,122.10 will be deducted from Brockway's share of the 5% overhead fee due the Howard group.

"(5) Neither the Palmer group nor Wilson are required to contribute to the construction cost overrun. All claims of the defendants and Howard Electric Company for contribution to the construction cost overrun are denied.

"(6) Plaintiffs are not entitled to reimbursement of $29,709.41 paid to Isenhagen and Bowman for their supervisory services.

"(7) Plaintiffs are not entitled to reimbursement of any part of the $62,500.00 fee paid to Flaugh Construction Company.

"(8) Plaintiffs are not entitled to reimbursement of $9,061.51 paid to Howard Electric Company for materials.

"(9) Plaintiffs are not entitled to recover damages of $134,000.00 based on deletions in specifications made by the Howard group.

"(10) Plaintiffs are not entitled to damages for the failure of the Howard group to save the joint venture the general contractor's usual 10% fee of the contract.

"(11) Defendants are required to repair the roof, sidewalks and portal beams at their expense within sixty days of the date of filing this memorandum opinion.

"(12) Defendants are not required to reimburse the operating fund of the joint venture the sum of $40,351.55 paid in interest on the interim construction loan.

"(13) Defendants are required to pay $3,443.69 to the joint venture based on Lindstedt's calculations.

All claim for damages or other relief not expressly allowed herein is denied.

The trial judge held that this clause, when considered in conjunction with other provisions of the contract, limited the liability of the Palmer group in the absence of an agreement by the Palmers to contribute to any cost overruns (in excess of the long-term financing proceeds).

■ The determination of the trial court in this regard was essentially an interpretation of the meaning of clause 6 of the agreement, as the same was intended by the contracting parties. Determining the meaning of a contract provision, as opposed to ruling on the legal operation or effect of such a provision, is not only a question of law but has factual aspects as well. 3 Corbin on Contracts § 554 (1960 ed.) at p. 219.[2]

■ The trial judge in this case received extrinsic evidence involving actions and conduct of the parties, together with expressions, all for the purpose of ascertaining the intent of the parties in adopting clause 6 of the contract. This was proper because the clause is ambiguous. It is not specific as to the effect of exceeding the long-term financing proceeds. Therefore, use of extrinsic evidence does not violate the parol evidence rule. It is rather a method for ascertaining the intent of the parties where this intent is in doubt. The background facts and circumstances leading to the inclusion of this provision are relevant. Evensen v. Pubco Petroleum Corp., 274 F.2d 866, 872 (10th Cir. 1960).

■ The finding of the court as to the meaning of this is, therefore, a matter of fact which is not to be set aside unless clearly erroneous. There is substantial evidence in the record showing that the parties intended this clause to be binding on the Howard group:

1. The Howard faction came to the Palmers in the first place with the deal and undertook to be fully responsible for the contracting and building of the shopping center.

2. The general structure of the contract supports this viewpoint. The contract contemplated that the amount of cash to be contributed by the venturers at the outset was $30,000.00 total. Loan proceeds were the only other source of cash.

3. The loaned funds were the only funds contemplated by the parties throughout their dealings.

4. In the Howards' contract with Wilson there is evidence that these parties recognized that the Palmers were not bound to contribute funds in excess of the loaned funds.

5. In an agreement dated May 13, 1968 there was recognition that the Howards had guaranteed a maximum construction cost.[3]

■ In the face of these and other facts and circumstances, it cannot be said that the trial judge erred in determining that the contractual provision constituted a limit to the liability of the Palmers.

2. The author's comment reads:
The question of interpretation of language and conduct—the question of what is the meaning that should be given by a court to the words of a contract, is a question of fact, not a question of law
. . .

3. The following testimony of J. A. Palmer furnishes some evidence that the parties intended that the Palmers would not be required to respond for any overrun:
"[W]e made it perfectly clear to them (the Howards) from the very beginning, from the time it was first mentioned that there might be an overrun, but we didn't feel we had any legal responsibility for any overrun period under any circumstances. We did indicate to them that we felt that if there was in fact a legitimate overrun not as a result of any failure on their part that we might feel a moral responsibility to participate in some overrun and if they could establish to our satisfaction through accounting that there was in fact an overrun and it was not the result of their negligence or their fault, then we would consider participating, otherwise absolutely not."

## II.

### WHETHER THE HOWARD GROUP IS ENTITLED TO THE FIVE PERCENT CONTRACTOR'S FEE

The trial court first found that the Howard group had rightfully earned the five percent fee provided for the general contractor in paragraph 5(b) of the joint venture agreement. The judge recognized that the Howards were not receiving a full fee for contracting the entire job, obtaining the financing and undertaking the leasing. In unmistakable terms the court awarded the Howard group, including Wilson, five percent of the loaned funds.[4] It was surprising, therefore, to read later in the trial court's opinion that the Howard group was being charged with the remaining $10,000.00 plus, which would permit Wilson to have his entire fee. Also, the $19,122.00 paid to Brockway, who was a member of the Howard group, was allowed. This was ruled to be part of Brockway's share of the five percent overhead fee.

When the trial court entered judgment it said that while the Howards were entitled to a five percent fee they could receive it only from funds available out of the proceeds of the long-term financing. Thus, the court said that they could get their fee only if they could find some more funds within the permissible range of loaned funds. We find this approach to be unreasonable and somewhat inconsistent.

■ It is unreasonable because there is no restriction in the joint venture contract on the Howard group's receiving five percent (which was incidentally one-half of the normal fee). The contract did not say that this was payable only if the loaned funds were sufficient after all other costs and expenses. Thus, we are dealing with a specific undertaking of the entire joint venture, and consequently it is a problem substantially different from that which we considered first above here, namely, whether paragraph 6 of the joint venture contract set a limit. If it were the intent of the parties to have such a limitation here, this should have been stated specifically. It would have been easy for the Palmers to require that the actual building would have to be limited to 95 percent of the loaned funds in order for the Howard group to get its fee. This it did not do.

The trial court's ruling is internally inconsistent because it allows Brockway to keep the funds paid to him. It allows Wilson to retain the funds that had been paid to him. In both instances these amounts are charged to the five percent overhead fee. To compound the injury it is directed that the balance of Wilson's fee be paid to him by the Howard group. The judge must have reasoned that money paid is money gone in this particular context. Such reasoning appears superficial. It is more reasonable to require the joint venture to shoulder this five percent fee. The result would be that the amounts paid to Brockway and to Wilson would be credited. The balance would be charged to the members of the joint venture, that is, the Howard group and the Palmers. A proposed distribution is appended hereto.

## III.

### THE QUESTION WHETHER WILSON IS REQUIRED TO PARTIALLY INDEMNIFY THE OTHER MEMBERS OF THE HOWARD GROUP

Having concluded that the Howard appeal challenging the trial court's construction of clause 6 of the joint venture contract is without merit, we must now consider the trial court's ruling which

---

4. On this it was said:

The Howard group, including Wilson, did act as general contractor on the project and as such earned the 5% overhead fee provided for in Paragraph Numbered 5(b) of the joint venture agreement. However, they are not entitled to 5% of the excess of construction cost over $1,725,000.00, the amount of the long-term loan.

The court recognized that Wilson had been paid $24,310.97 and said that this was chargeable to his fee and that he could keep it.

denied the Howards' third-party claim against Wilson.

The trial court pointed out that the members of the Howard group had agreed under the indemnity contract of July 1, 1968 to make additional capital contribution if such were required by reason of insufficient funds to meet the cost of construction, but added that Wilson's obligation under paragraph 2(c) of the July 1, 1968 agreement was to arise only in the event that additional capital contribution was necessary by reason of insufficient funds to meet either the cost of construction or future operating costs. The court added: "Defendants have not established that the long-term loan was in fact insufficient to meet construction costs." The judge noted that one witness, Brockway, had said that certain changes and deletions could have been made which would have reduced construction costs but that he decided to retain these features. From this he concluded: "Under these circumstances, Wilson is not obligated to contribute to the construction overrun and the third-party complaint of all the defendants and Howard Electric Company against him is dismissed."

We must disagree with the trial court's reasoning on this because the July 1, 1968 agreement does not impose any such burden on the remaining Howard group and does not predicate their right to partial indemnity on their ability to prove that the overrun was due to their fault. Wilson undertook a contractual obligation to the remaining members of the Howard group on July 1, 1968 to join in obtaining secondary financing should such additional funding become necessary. Wilson also agreed to bear his proportionate share of any excess payments made for construction costs. The July 1, 1968 agreement provided for potential default by one of the parties by including the following provision:

[T]he remaining parties (or any one of them) shall have the right to advance the share of said defaulting party, in which event the party or parties so making such advances shall be entitled to interest on the amount thereof at the rate of 12½% per annum, and said advances shall be a lien upon all the right, title and interest of the defaulting party in and to the above mentioned Joint Venture Agreement . . . ."

As we see it then, Wilson was bound absolutely to share in the payment of excess expenditures under the 1968 agreement.[5]

Wilson argues here as he did in the trial court that his obligation to pay these additional costs was dependent upon proof that the long-term loan proceeds were insufficient.[6] Wilson would have us rule that the Howards must have the burden of proving that there was an insufficiency of funds prudently expended. The trial court went along with this argument, but we cannot do so because, as we see it, it is contrary to the record and to the trial court's other findings. Relief was denied by the trial court to the Palmers on each of five allegations of improper disbursements by the Howard group. The trial court did not free the Palmers from contribution on the basis of improper expenditures on the part of the Howards. Instead, the court determined that it was paragraph 6, the maximum expenditure provision of the joint venture agreement, which exonerated the Palmers. That provision cannot free Wilson because he was a member of the Howard group and, as we have shown, he undertook to contribute his share of the excess expenditures in the July 1, 1968 agreement with the Howards. Therefore, the Howards are

5. *See generally* 17 Am.Jur.2d § 294.

6. The actual agreement reads: "The parties hereto agree that in event any additional capital contribution shall be required of the parties *by reason of insufficient funds to meet costs of construction* or future operating costs, or other expenses, the following procedures shall apply." (Emphasis added).

entitled to recover on their third-party claim from Wilson 40 percent of $108,500.00 or $43,400.00.

The trial court is directed to enter judgment accordingly.

## IV.

One point remains. The court has ordered a certified audit and at the same time has rendered relief on the various contracts. We are unable to understand what further proceedings could be taken based upon a certified audit. The reason for a certified audit is not given. The judge does not point to any defalcations. If the court had directed that there be a detailed accounting furnished by the Howards, the order would be understandable. It would seem, therefore, that the result would be more rational if the Howards were ordered to furnish a detailed accounting of their stewardship in accordance with the contract.[7] If this proved to be insufficient in any respect, an audit of that part of the accounting could be ordered.

The judgment of the district court is affirmed in part, is reversed in part and is remanded to the court for the entry of judgment in accordance with the directions which are given and for the purpose of entering further orders with respect to the accounting (in accordance with the views expressed herein).

## ADDENDUM

As we have determined above, the Howard group is entitled to its five percent overhead fee, provided for in paragraph 5(b) of the joint venture agreement. The five percent fee amounts to $86,250.00 (five percent of $1,725,000.-00). Of that total, $37,248.47 has already been paid ($24,310.97 to Wilson and $12,937.50 to Brockway).[1] Therefore, $49,001.53 in overhead fees remain to be paid. The Palmer group, as 50 percent joint venture owners, is responsible for one-half of the financial burden for the five percent fee. This makes the Palmers liable in the amount of $24,500.77, which sum is adjudged payable to the Howard group. From the $24,500.77 sum, $10,189.03 is payable to K. E. Wilson in accordance with the judgment of the trial court. The remaining $14,311.74 is payable to the other members of the Howard group, excluding Brockway, to be allocated by the trial court in accordance with each member's entitlement.[2]

7. The terms of the contract do not provide for a certified audit to be furnished solely by the Howards.

1. Brockway actually received $19,122.10. This is more than the amount to which he was entitled. However, since the parties have not objected to these excess receipts by Brockway either at trial or on appeal, we do not consider this matter further; it is sufficient to say that Brockway is not entitled to additional remuneration from the five percent overhead fee.

2. In arriving at the above determination, we have also given consideration to the question of whether the portions of the five percent fee already paid to Wilson and Brockway from the long-term development funds should be credited against the total development cost of the project (not including the five percent fee), thereby reducing the amount of cost overrun for which the Howard group is responsible. We have determined, however, that in light of the peculiar facts and equities of the instant case, this question of overruns and credits is wholly independent of and does not affect the issue here to be decided, that is, the portion of the five percent fee still due to the Howard group and the responsibility of all the joint venture participants to pay this remaining obligation.