751 F.2d 1131
 40 UCC Rep.Serv. 240
 PHILADELPHIA GEAR CORPORATION, Plaintiff-Appellant Cross-Appellee,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, a national
corporation, in its official capacity as Receiver of Penn
Square Bank, N.A., and Federal Deposit Insurance
Corporation, a national corporation, in its corporate
capacity, Defendants-Appellees Cross-Appellants.
 Nos. 84-1901, 84-2007.
 United States Court of Appeals,
Tenth Circuit.
 Dec. 27, 1984.
 
 Gerald F. Slattery, Jr. of Gordon, Arata, McCollam, Stuart & Duplantis, New Orleans, La. (William B. Rogers and R. Steven Haught, Ames, Daugherty, Black, Ashabranner, Rogers & Fowler, Oklahoma City, Okl., of counsel), for plaintiff-appellant/cross-appellee.
 Charles C. Baker of Gable & Gotwals, Tulsa, Okl. (James Vogt and Ross A. Plourde of Reynolds, Ridings & Hargis, Oklahoma City, Okl., and David L. Bryant of Gable & Gotwals, Tulsa, Okl. with him on briefs; Daniel W. Persinger, Deputy Gen. Counsel, and Lawrence F. Bates, Counsel, Federal Deposit Insurance Corporation, Washington, D.C., of counsel), for defendants-appellees/cross-appellants.
 Before DOYLE, McWILLIAMS and LOGAN, Circuit Judges.
 LOGAN, Circuit Judge.
 
 
 1
 This appeal is another arising out of the many suits resulting from the failure of the Penn Square Bank, N.A. in Oklahoma City, Oklahoma, in 1982. In this case, plaintiff Philadelphia Gear Corporation seeks to enforce, as beneficiary, a standby letter of credit issued by Penn Square before its insolvency. The parties dispute the amount covered by the document. Philadelphia Gear seeks judgment against the Federal Deposit Insurance Corporation (FDIC) in its capacity as insurer for $100,000.00 in deposit insurance proceeds and seeks judgment against the FDIC as receiver of Penn Square for $624,728.50, which it alleges to be the total uninsured outstanding balance of the letter of credit. Several legal issues are presented in this appeal.
 
 
 2
 The FDIC in its capacity as insurer argues that the district court, 587 F.Supp. 294, erred when it held: (1) that the standby letter of credit represented a "deposit" as defined in 12 U.S.C. Sec. 1813(l )(1) and thus was an insured deposit under 12 U.S.C. Sec. 1813(m); (2) that Philadelphia Gear was the insured depositor for purposes of the statute; and (3) that prejudgment interest should be assessed against the FDIC as insurer of the $100,000.00 deposit insurance proceeds. Philadelphia Gear, as cross-appellant, claims that the district court erred in concluding that the letter of credit is ambiguous and in construing its amount as $145,200.00 rather than the larger sum claimed by Philadelphia Gear.
 
 
 3
 * Orion Manufacturing Corporation, a customer of Penn Square, produces pumping units for oil production in Oklahoma and Texas. Philadelphia Gear is a trade supplier who furnished some of the major elements of Orion's pumping jacks. On April 23, 1981, Penn Square issued an irrevocable standby letter of credit upon the application of Orion for the benefit of Philadelphia Gear. The letter was for $145,200.00 and expired August 1, 1982. The letter provided that drafts drawn upon it must be accompanied by:
 
 
 4
 "(1) Your [Philadelphia Gear's] signed statement that you have invoiced Orion Manufacturing Corporation and that said invoices have remained unpaid for at least fifteen (15) days
 
 
 5
 (2) Copy of all invoices
 
 
 6
 (3) All invoices will be verified for authenticity and payment with Orion Manufacturing Corporation.
 
 
 7
 (4) We hereby agree with drawers, endorsers and bona fide holders of all drafts, drawn under and in compliance with the terms of this credit, that such drafts will be duly honored upon presentation to the drawer."
 
 
 8
 Pl. Ex. 1. That same day Orion executed an unsecured note in the amount of $145,200.00 in favor of Penn Square as security for the letter of credit. The maturity date of the note was August 1, 1982, the same day the letter of credit expired.
 
 
 9
 A few days later, Penn Square, at the request of Philadelphia Gear, amended the letter of credit by deleting paragraph (3), quoted above, which required invoices to be verified for authenticity, and added the following language requested by Philadelphia Gear:
 
 
 10
 "This credit shall be automatically reinstated from time to time for any sum or sums up to $145,000.00 upon presentation of described documents. This credit and all reinstatements are irrevocable and shall expire on August 1, 1982."
 
 
 11
 Pl. Exs. 1 and 14.
 
 
 12
 On July 5, 1982, the Comptroller of the Currency declared Penn Square insolvent and appointed the FDIC as its receiver. Two days later Philadelphia Gear, through a remitting bank, presented to the receiver for payment three drafts on the letter of credit totalling $242,370.00. On July 22, 1982, Philadelphia Gear, in the same manner, presented to the receiver for payment five additional drafts on the letter of credit totalling $482,358.50. A few days later Philadelphia Gear received a letter dated July 21, 1982, from Penn Square's liquidator formally giving notice that the receiver disaffirmed "any and all" obligations under the letter of credit in question and stating that it would not honor any drafts thereon. During the next week, the liquidator returned unpaid all eight drafts that had been presented under the letter of credit. This litigation ensued. After the district court ruled in favor of Philadelphia Gear on all of the issues dealing with deposit insurance and in favor of the FDIC as receiver on the question of the total value of the letter of credit, both sides appealed.
 
 II
 
 13
 * The first issue we consider is whether the standby letter of credit is a "deposit" within the meaning of 12 U.S.C. Sec. 1813(l )(1). That section defines a "deposit" as:
 
 
 14
 "the unpaid balance of money or its equivalent received or held by a bank in the usual course of business and ... which is evidenced by ... a letter of credit ... on which the bank is primarily liable: Provided, That, without limiting the generality of the term 'money or its equivalent', any such account or instrument must be regarded as evidencing the receipt of the equivalent of money when credited or issued in exchange for ... a promissory note upon which the person obtaining any such credit or instrument is primarily or secondarily liable ...."
 
 
 15
 The district court, after examining the section's legislative history, concluded that the letter of credit satisfied Sec. 1813(l )(1)'s definition of a deposit:
 
 
 16
 "First, although the letter of credit was not issued in exchange for legal tender, it must be considered as having been issued in exchange for 'money or its equivalent' because it was issued in exchange for Orion's promissory note. 12 U.S.C. Sec. 1813(1 )(1). Second, the letter of credit itself is one on which the bank is primarily liable."
 
 
 17
 R. III, 755.
 
 B
 
 18
 The FDIC argues that the "money or its equivalent received" element of the section's definition is unsatisfied because there was no advance made on the promissory note executed by Orion in favor of Penn Square before the bank became insolvent. Both Orion and Penn Square understood that nothing would be considered due on this note nor would interest be charged unless and until Philadelphia Gear presented to Penn Square the requisite documents detailed in the letter of credit, which it had not done at the time of the bank's insolvency. The Uniform Commercial Code requires that negotiable instruments contain an unconditional promise to pay on the part of the maker or drawer. See U.C.C. Sec. 3-104(1)(b), Okla.Stat.Ann. tit. 12A Sec. 3-104(1)(b). Consequently, the FDIC argues that Orion's note was nonnegotiable because it represented only a contingent obligation. We do not agree.
 
 
 19
 Whatever contingencies may have been orally agreed to between Orion and Penn Square, none are expressed in the note itself. The negotiability of an instrument must be determined from the face of the instrument, without regard to extraneous agreements. See U.C.C. Sec. 3-105(2)(a) and Official Comment. Orion's promissory note to Penn Square is a form note with standard terms. The note states that the purpose of the loan was "Back up Letter of Credit # 1042," but it does not contain any expression that no money has been advanced. The note's negotiability is not predicated on the presentation of documents under the letter of credit. See id. Sec. 3-105(1)(d) (statement that note is drawn under a letter of credit does not make promise or order conditional).
 
 
 20
 Even if we ignore the note's appearance as an unconditionally negotiable instrument, what is important here is that the bank agreed to make funds available for the benefit of its customer, Orion, and by the promissory note it secured Orion's obligation to pay the bank for any advances it made. A commercial transaction occurred that set in motion other commercial activity in reliance thereon; the bank issued a document upon which its customer's supplier could draw in lieu of relying upon the customer's own ability to pay. The bank's customer had signed a promissory note obligating it to repay advances made by the bank, with interest. Therefore, we hold that the transaction qualifies as one in which "money or its equivalent" was issued in exchange for a promissory note.
 
 C
 
 21
 The FDIC also argues that this is not a letter of credit on which the bank is "primarily" liable. To properly analyze this issue requires an understanding of the two types of letters of credit: the commercial letter, which is used to facilitate the documentary sale of goods, and the standby letter, which is used to protect a third party against the customer's default on an underlying obligation. Professor Clark describes the similarities and differences of these two documents:
 
 
 22
 "A letter of credit (whether of the commercial or standby variety) is an engagement by an issuer (almost always a bank) to a beneficiary (such as a seller of goods), made at the request of a customer (such as a buyer of goods), that binds the issuing bank to honor drafts up to the amount of the credit upon the beneficiary's presentment of the documents required by the terms of the letter.
 
 
 23
 If a commercial letter is involved, the documents will normally include a bill of lading and invoice; if a standby letter is involved, the key document will probably be a certificate of default by the customer on the underlying obligation."
 
 
 24
 B. Clark, The Law of Bank Deposits, Collections and Credit Cards, p 8.2 at 8-5 (rev. ed. 1981) (footnote omitted).
 
 
 25
 The FDIC argues that the language in Sec. 1813(l )(1) referring to letters of credit on which the bank is primarily liable was intended to refer to commercial letters and not to standby letters such as the one involved in this case. The FDIC asserts that it assisted in drafting a significant portion of the statute and that it has been charged with administering the provisions of Sec. 1813. Accordingly, it contends that its interpretation of the statute is entitled to substantial deference and should be followed absent compelling indications that it is wrong. See Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969).
 
 
 26
 We acknowledge that deference is often appropriately given to an agency's interpretation of the statute it must administer. Federal Election Commission v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981). This deference is particularly justified if Congress has explicitly left a gap for the agency to fill as then "there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc., --- U.S. ----, ----, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), 52 U.S.L.W. 4845, 4847 (U.S. June 25, 1984). We also note, however, that a reviewing court should consider in giving weight to an administrative position "the thoroughness evident in [the administrative body's] consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements ...." Adamo Wrecking Co. v. United States, 434 U.S. 275, 287 n. 5, 98 S.Ct. 566, 574 n. 5, 54 L.Ed.2d 538 (1978) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944)).
 
 
 27
 There is no evidence that Congress explicitly delegated to the FDIC authority to refine the definition of a deposit contained in Sec. 1813. Moreover, the FDIC has not acted as if it possessed such authority by promulgating federal regulations pinpointing Sec. 1813's precise meaning. Consequently, we must examine the thoroughness, validity, and consistency of the FDIC's interpretation of Sec. 1813.
 
 
 28
 The FDIC first contends that a standby letter of credit is in essence a guaranty of the account party's performance because the issuing bank's obligation is triggered only if the account party defaults on the underlying contract. It claims that standby letters of credit are of questionable legality because national banks are not empowered to act as a surety or guarantor of another party's debts. See 12 U.S.C. Sec. 24; First Empire Bank-New York v. FDIC, 572 F.2d 1361, 1367 (9th Cir.), cert. denied, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978).
 
 
 29
 The FDIC's position on this issue is contrary to federal regulations promulgated by the Comptroller of the Currency. See 12 C.F.R. Sec. 7.7016.[1] In addition, the Comptroller expressly has included standby letters of credit in the federal regulations imposing lending limitations on national banks. 12 C.F.R. Sec. 32.2(d) and (e). The FDIC's contention is contrary to positions taken by the FDIC in other litigation. See FDIC v. Freudenfeld, 492 F.Supp. 763, 767 (E.D.Wis.1980) ("FDIC argues that a 'standby' letter of credit is not a guaranty.").
 
 
 30
 We acknowledge that a standby letter of credit is similar in many respects to a surety's contract to guaranty a principal's debt. Indeed some commentators refer to it as a "guaranty letter of credit." See Verkuil, Bank Solvency and Guaranty Letters of Credit, 25 Stan.L.Rev. 716 (1973). The drafters of Article 5 of the Uniform Commercial Code reflected commercial practice when they described issuing banks' expectations that their customers will put in funds before banks make disbursements under a letter or at least reimburse a bank immediately afterwards. U.C.C. Sec. 5-117, Official Comment. The UCC drafters also contended that the issuing bank "assumes minimum risks as against its customer." U.C.C. Sec. 5-109, Official Comment 1.
 
 
 31
 Nevertheless, a bank issuing a standby letter assumes a significantly less conditional liability than a surety assumes at common law or an accommodation party assumes under Article 3 of the UCC. We believe this facet of standby letter liability places it closer to the paradigm of primary liability. An ordinary guarantor generally will be able to assert "real defenses," see U.C.C. Sec. 3-415, even in the most extreme cases of secondary liability, as when it undertakes to guarantee payment on a negotiable instrument under U.C.C. Sec. 3-416(1) and then attempts to assert defenses against a holder in due course. In less extreme cases, the surety may almost always assert the principal's defenses to avoid payment to a creditor. See J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code Sec. 13-17 at 531-35 (2d ed. 1980). Issuers of standby letters have no such luxury.
 
 
 32
 The liability of a bank issuing a standby letter of credit is nearly absolute: it may dishonor a claim if there are irregularities in documents presented, see U.C.C. Sec. 5-114; but otherwise it must pay claims against the letter even if the customer has ordinary defenses from the underlying transaction such as failure of consideration[2] or--analogous to Article 3 "real defenses," U.C.C. Sec. 3-305--illegality or fraud in the inducement. See, e.g., Philadelphia Gear Corp. v. Central Bank, 717 F.2d 230, 236-38 (5th Cir.1983); Voest-Alpine International Corp. v. Chase Manhattan Bank, 707 F.2d 680, 682 (2d Cir.1983); KMW International v. Chase Manhattan Bank, 606 F.2d 10, 15-16 (2d Cir.1979); J. White & R. Summers, supra, Sec. 18-2 at 711-12. Thus in the instant case the bank must pay whenever the beneficiary, Philadelphia Gear, represents in writing that Orion has not paid invoices outstanding for fifteen days and attaches copies of these invoices. The bank's obligation exists whether or not Orion has legal defenses for nonpayment.
 
 
 33
 This circuit has previously held under different facts that standby letters of credit represent primary, not secondary, obligations of the issuing bank. Fidelity Bank v. Lutheran Mutual Life Insurance Co., 465 F.2d 211, 213 (10th Cir.1972); see also Voest-Alpine International Corp., 707 F.2d at 682. We reject the FDIC's argument to the contrary.[3]
 
 
 34
 The FDIC's second argument is that the federal deposit insurance fund is structured in a manner that excludes standby letters from the scope of Sec. 1813. Its reasoning is essentially as follows: Congress established explicit guidelines to be applied in determining the amount each member bank should contribute to this insurance fund, see generally 12 U.S.C. Sec. 1817 (assessment section); this assessment formula is predicated on individual bank liabilities that would be absolutely due and owing in the event of a bank failure; a bank's liability under a standby letter of credit is necessarily contingent on the bank customer defaulting on its contract with the beneficiary of the standby letter; and Congress never intended the FDIC to attempt to evaluate and assess the risks associated with such contingent liabilities. Therefore, obligations on standby letters are not "deposits" within Sec. 1813.
 
 
 35
 Section 1817 does establish elaborate guidelines in determining proper assessment amounts for member banks. Subsection 4 addresses the obligation of an insured bank to report its total liability in deposits. In doing so, that section expressly refers to Sec. 1813(l ) for the definition of "deposit." Section 1813(l )(1) includes within the definition of a deposit, "a letter of credit ... on which the bank is primarily liable." Nowhere does the language of Sec. 1817 support the FDIC's assertion that a standby letter does not represent an absolute liability. We find nothing in the statute or its legislative history narrowing the definition of a deposit to exclude standby letters. See generally 1950 U.S.Code Cong. & Ad.News 3765-3779. Federal regulations promulgated pursuant to this section expressly include letters of credit, without differentiating between types, among the several documents that may be evidence of an insured deposit obligation. See 12 C.F.R. Sec. 330.11.[4] As previously discussed, both commercial and standby letters represent primary bank liabilities.
 
 
 36
 The language including letters of credit on which the bank is primarily liable in the definition of deposit in Sec. 1813 was added in 1960. See Pub.L. No. 86-671, 74 Stat. 546 (1960). The purpose for this and accompanying amendments was to simplify the process of determining the assessments paid by banks insured by the FDIC. See Sen.Rep. No. 1821, 86th Cong.2d Sess. reprinted in 1960 U.S.Code Cong. & Ad.News 3234. Nothing in the legislative history that we have found mentions a specific congressional intent for the addition of the references to letters of credit. The absence of any legislative intent to exclude standby letters from the plain language of Sec. 1813 dictates the conclusion that these instruments are within the statutory definition of a "deposit." See Consumer Product Safety Comm'n v. G.T.E. Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) ("Absent a clearly expressed legislative intention to the contrary, [statutory] language must ordinarily be regarded as conclusive."). We therefore affirm the district court's judgment that letters of credit constitute insured deposits.
 
 III
 
 37
 The FDIC argues that plaintiff Philadelphia Gear is not the depositor entitled to recover the deposit insurance proceeds. The law provides that the records of the insolvent bank are conclusive as to a claimant's entitlement to deposit insurance. See 12 U.S.C. Sec. 1822(c); 12 C.F.R. Sec. 330.1(b). Philadelphia Gear presented its drafts two and seventeen days after the Comptroller of the Currency declared Penn Square insolvent. Consequently, FDIC argues, at the time of insolvency Philadelphia Gear's claims were unrecorded contingent liabilities, and it cannot rely upon acts performed after the bank's insolvency to entitle it to deposit insurance.
 
 
 38
 The Ninth Circuit has addressed this issue in First Empire Bank-New York v. FDIC, 572 F.2d 1361, 1367-69 (9th Cir.), cert. denied, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978). It held that beneficiaries of standby letters of credit possessed provable claims even though they presented drafts under the letters after the FDIC declared the issuing bank insolvent. In reaching this conclusion the court required three conditions to be met: the claims were in existence prior to insolvency and not dependent on obligations arising after insolvency; total liability was certain when the beneficiaries sued the bank's receiver; and the claims were made in a timely manner, before assets were distributed from the receivership estate. Id. We agree with and adopt that approach. The analysis adequately accommodates the FDIC's valid concern of protecting against false claims while permitting legitimate claimants a reasonable time after the determination of insolvency to present their claims to insurance proceeds. Applying this test to the facts before us, Orion's default, at least as to the claims presented two days after the receiver took over the bank, occurred before Penn Square was declared insolvent; the claims were not dependent upon obligations arising after the insolvency; the claims were absolute and certain in amount and were presented before assets were distributed from the receivership estate. Philadelphia Gear, as beneficiary, is the only party permitted to make a demand on the issuing bank for amounts under the letter of credit; logically it should be considered the depositor in the event the issuing bank becomes insolvent. Cf. 12 C.F.R. Sec. 330.11 (transferee of insured deposit obligations evidenced by a letter of credit entitled to claim insurance). We hold that Philadelphia Gear, the beneficiary of the letter of credit, is the "depositor" for purposes of entitlement to the insurance proceeds.
 
 IV
 
 39
 The district court allowed Philadelphia Gear prejudgment interest from the FDIC in its capacity as insurer on the $100,000 deposit insurance proceeds and from the FDIC in its capacity as receiver on the delayed dividend for the excess. The FDIC has not appealed the prejudgment interest ruling on the delayed dividend, but it asserts that the district court erred in granting prejudgment interest on the $100,000.00 insurance proceeds. We agree and hence reverse this part of the court's award.
 
 
 40
 Absent an express waiver, sovereign immunity bars suit against the United States government or its agencies. By statute, 12 U.S.C. Sec. 1819, the FDIC has the capacity to sue and to be sued. But that does not waive the sovereign immunity doctrine on claims for prejudgment interest. See Boston Sand and Gravel Co. v. United States, 278 U.S. 41, 47, 49 S.Ct. 52, 53, 73 L.Ed. 170 (1928); United States v. Mescalero Apache Tribe, 207 Ct.Cl. 369, 518 F.2d 1309, 1316-1319 (1975), cert. denied, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). The FDIC insurance statute, 12 U.S.C. Sec. 1821(f), permits delays in paying insurance when the FDIC is in doubt about the validity of a claim to insurance proceeds:
 
 
 41
 "[T]he Corporation, in its discretion, may require proof of claims to be filed before paying the insured deposits, and that in any case where the Corporation is not satisfied as to the validity of a claim for an insured deposit, it may require the final determination of a court of competent jurisdiction before paying such claim."
 
 
 42
 Id. Thus, Congress expressly recognized that delays would occur in paying some insurance claims, yet it did not expressly waive its immunity to prejudgment interest. Under those circumstances we must hold that prejudgment interest should not have been awarded on the claims for insurance proceeds.
 
 V
 
 43
 The cross-appeal raises the issue of whether the district court erred in holding that the total value of the letter of credit Penn Square issued was $145,200.00 and not $724,628.50 as Philadelphia Gear contends. When Penn Square issued the original letter of credit on April 23, 1981, its amount was clearly limited to $145,200.00. On May 6, 1981, however, Philadelphia Gear had the letter of credit amended to delete paragraph three and add a new paragraph which reads: "This credit shall be automatically reinstated from time to time for any sum or sums up to $145,000 upon presentation of described documents. This credit and all reinstatements are irrevocable and shall expire on August 1, 1982." The district court found this amendment created an ambiguity concerning the total value of the letter of credit. It explained the ambiguity, as it saw it, as follows:
 
 
 44
 "It is unclear whether the parties intended the language 'any sum or sums up to $145,000.00' to be 'any sum or sums up to $145,000.00 in the aggregate' or 'any sum or sums up to $145,000.00 per presentation.' If it is the former, then the parties merely allowed for multiple, partial drafts totaling up to $145,000.00. But if the parties intended the latter, then the credit is unlimited; the beneficiary Philadelphia Gear could present myriad drafts, each up to $145,000.00."
 
 
 45
 R. III, 742-43. The district court admitted and considered extrinsic evidence and found that the letter of credit was in fact limited to $145,200.00 in the aggregate.
 
 
 46
 The FDIC argues that the district court's determination cannot be set aside unless clearly erroneous. Philadelphia Gear argues that the district court's finding in this regard was a legal one and thus is entitled to no deference.
 
 
 47
 Whether a contractual provision is ambiguous on its face is a legal question. Southwest Stationery & Bank Supply, Inc. v. Harris Corp., 624 F.2d 168, 170 (10th Cir.1980). Once the court determines that the contract is ambiguous, and resorts to extrinsic testimony or other evidence to ascertain the meaning of the ambiguous terms, its determination of the proper meaning becomes a factual question. Rockwood & Co. v. Adams, 486 F.2d 110, 112 (10th Cir.1973); Palmer v. Howard, 493 F.2d 830, 835 (10th Cir.1974). In that circumstance the district court's interpretation, aided by extrinsic evidence cannot be set aside unless clearly erroneous. Carpenters & Millwrights Health Benefit Trust Fund v. Gardineer Dry Walling Co., 573 F.2d 1172, 1173 (10th Cir.1978).
 
 
 48
 We agree with the district court that paragraph three is subject to at least two interpretations. Thus, the district court properly considered extrinsic evidence to resolve the ambiguity, and we must find that its conclusion limiting the value of $145,200.00 is clearly erroneous before we may reverse.
 
 
 49
 Philadelphia Gear argues that the language of the ambiguous paragraph should have been construed against Penn Square, the issuing bank.[5] The district court ruled that the language of a letter of credit, if ambiguous, must be interpreted against the drafting party. Although it did not rely wholly on that rule in resolving the issue, the court found that Philadelphia Gear had requested and drafted the new paragraph and the ambiguity should be resolved against Philadelphia Gear. This court has held that ambiguities in written documents are to be construed against the drafter. Williams Petroleum Co. v. Midland Cooperatives, Inc., 679 F.2d 815, 821 (10th Cir.1982). The rule is equally applicable to letters of credit. East Girard Savings Ass'n v. Citizens National Bank & Trust Co., 593 F.2d 598, 602 (5th Cir.1979). The evidence is clear that Philadelphia Gear drafted this amendment. Pl.Ex. 1 and 14. Accordingly, we find that the district court properly construed the ambiguous provision against Philadelphia Gear. That it was also the beneficiary of the letter of credit is of no legal significance.
 
 
 50
 The district court heard two days of testimony, from several witnesses, on the parties' intention with respect to the ambiguous paragraph. We have examined that record evidence and cannot find that the district court erred in limiting the total value of the letter of credit to $145,200.00.
 
 
 51
 We affirm the judgment of the district court in all respects except for its finding on prejudgment interest. With respect to the prejudgment interest issue we reverse and remand for further proceedings consistent with this opinion.
 
 
 
 [1]
 This section states expressly that "[a] national bank may issue letters of credit permissible under the Uniform Commercial Code or the Uniform Customs and Practice for Documentary Credits to or on behalf of its customers." The Uniform Commercial Code contemplates that banks may issue standby letters of credit. See U.C.C. Secs. 5-102(1)(a), 5-103(1)(a) and (b)
 
 
 [2]
 U.C.C. Sec. 5-114(2) allows a "fraud in the transaction" defense against payment on a letter of credit in certain circumstances. The courts have disagreed on the scope of that exception to the ordinary rule that the issuer must pay. We express no opinion on that question, which is before us in another appeal
 
 
 [3]
 "Few arguments have provoked as much concern and deserved it less than the argument that standby letters of credit are unauthorized bank promises that the issuer may repudiate. Virtually all considered authority rejects this argument because (1) the issuance of standby-credits is consistent with traditional banking functions and (2) even if the activity were beyond the authority granted in the bank's charter, most authority holds that neither the bank nor its customer should be able to assert the defense."
 J. Dolan, The Law of Letters of Credit p 12.03 at 12-12 (1984).
 
 
 [4]
 "Deposits evidenced by negotiable instruments. If any insured deposit obligation of a bank be evidenced by a negotiable certificate of deposit ... or letter of credit, the owner of such deposit obligation will be recognized for all purposes of claim for insured deposits ...."
 
 
 [12]
 C.F.R. Sec. 330.11
 
 
 [5]
 Philadelphia Gear cites four cases to support this proposition. In Venizelos, S.A. v. Chase Manhattan Bank, 425 F.2d 461 (2d Cir.1970), Chase Manhattan Bank, and not the beneficiary, was the author of the relevant amendment that was the subject of the ambiguity. Id. at 466. In the other three cases the drafter was also the bank, not the beneficiary. See Marino Industries Corp. v. Chase Manhattan Bank, 686 F.2d 112, 115 (2d Cir.1982); West Virginia Housing Development Fund v. Sroka, 415 F.Supp. 1107, 1112 (W.D.Pa.1976); Housing Securities, Inc. v. Maine National Bank, 391 A.2d 311, 319 (Me.1978)